IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SAMIR ALLEN FARHOUMAND,                    )
                                           )
            Petitioner                     )
                                           )
    v.                                     )      1:16-cv-1265 (LMB/MSN)
                                           )
HAROLD CLARKE, DIRECTOR OF                 )
    VIRGINIA DEP'T OF CORRECTIONS,         )
                                           )
            Respondent.                    )

## MEMORANDUM OPINION

In this Petition for Habeas Corpus Relief under 28 U.S.C. § 2254, Samir Farhoumand

seeks an order vacating the Virginia Supreme Court's decision, which upheld his convictions on

two charges of indecent exposure, and remanding his case for retrial. [Dkt. No. 1] at 16. At his

bench trial before the Virginia Circuit Court, Farhoumand was found guilty of three counts of

indecent liberties with a minor. Id. at 2. He appealed his conviction to both the Virginia Court of

Appeals and the Virginia Supreme Court, arguing that the trial court misconstrued the statutory

meaning of "exposure" to include tactile exposure. Id. at 3-4. The Virginia Court of Appeals

found no error but the Virginia Supreme Court rejected the trial court's theory of "tactile

exposure," explaining that exposure required that genitalia were seen or could be seen. Id. After

reviewing the evidence and the basis upon which the trial court made its findings, the Virginia

Supreme Court concluded that the evidence supported conviction on two counts of exposure but

vacated petitioner's conviction on a third count. Farhoumand v. Commonwealth, 764 S.E.2d 95,

104 (2014). Petitioner's request for a writ of habeas corpus from the Virginia Supreme Court was

denied. Id. at 8-9.

Before the Court is respondent's Motion to Dismiss [Dkt. No. 9]. Petitioner, represented by counsel, filed a response. [Dkt. No. 13]. For the reasons that follow, the motion will be granted.

## I.   BACKGROUND

### A.  Circuit Court Proceedings

On May 21, 2012, a Virginia grand jury returned four indictments against petitioner, each for a violation of Virginia Code § 18.2-370(A)(1). State Habeas Pet., [Dkt. No. 10-1] at 4. Code § 18.2-370(A)(1) provides, in relevant part, that "Any person 18 years of age or over, who, with lascivious intent, knowingly and intentionally . . . [e]xpose[s] his or her sexual or genital parts to any child to whom such person is not legally married or propose[s] that any such child expose his or her sexual or genital parts to such person [is guilty of a Class 5 felony]." The four indictments arose from allegations that petitioner, a 21-23 year-old man at the times alleged, fondled his cousin, S.F., when S.F. was between 13-14 years old. Pet. Memo., [Dkt. No. 2] at 3. The abuse began shortly before Farhoumand graduated from the University of Virginia and continued while he was attending dental school at the University of California, Los Angeles. Farhoumand, 764 S.E.2d 95 at 100. The indictments, which covered a two-year time period, alleged:

1) Exposure of genitalia to S.F., a child of thirteen years of age, between September 3, 2009 and December 31, 2009.
2) Exposure of genitalia to S.F., a child of thirteen years of age, between January 1, 2010 and September 3, 2010.
3) Exposure of genitalia to S.F., a child of fourteen years of age, between September 4, 2010 and December 31, 2010.
4) Exposure of genitalia to S.F., a child of fourteen years of age, between January 1, 2011 and September 3, 2011.

[Dkt. No. 10-1] at 5.

Before trial, petitioner moved for a bill of particulars to narrow the time frames for the second and third indictments. June 8, 2012 Tr. at 1:12-13. Petitioner argued that more specific dates were important to the preparation of his defense. Id. at 3:16-20. The court denied the motion, explaining that the victim had testified at the preliminary hearing, during which petitioner's counsel had an opportunity to question the victim, and the Commonwealth represented that the victim was unable to provide specific dates. Id. at 3:21-4:23; 7:11-9:3.

Petitioner waived his right to a jury trial and received a bench trial on August 27 and 28, 2012. [Dkt. No. 10-1] at 6. In opening statements, the prosecution described how during the time periods covered by the indictments the petitioner "would grab [the victim's] penis, and also there were other times when he would pull his own pants down and take [the victim's] hand, and have [the victim] rub his own penis. And . . . those are going to be the time periods where there is the exposure under the statute." Aug. 27, 2012 Tr. at 22:17-20. With respect to the theory of exposure, the prosecution argued that it would "submit to the Court that it does fit the code section . . . when [the victim] testifies, that the [petitioner's] penis was exposed, and that he had [the victim's] hand on his penis." Id. at 24:12-17. The prosecution acknowledged that "that's the exposure that's not necessarily contemplated by the code section, but that certainly fits the code section." Id. at 24:18-22. The petitioner's opening statement admitted that there was fondling but denied that he was guilty of the exposure charges. Id. at 34:11-14. His counsel argued that there was no exposure, claiming that the petitioner thought the victim was asleep and emphasizing that "[t]he fondling occurred in the dark of night. It occurred when there were no lights on." Id. at 33:17-21.

The prosecution's case rested primarily on the testimony of the victim. At trial, the victim testified that the petitioner was a frequent visitor at this house and began sexually abusing him in

the winter of 2009, when the victim was in the seventh grade. Id. at 38:22-41:2. The victim woke up in his bed to find petitioner fondling him but did not recall whether the petitioner had pulled the victim's pajamas down or not. Id. at 41:3-42:22. (This time period was not charged in any of the indictments.) The petitioner continued to be a frequent guest at the victim's home while the victim was in the eighth grade, visiting during the petitioner's academic breaks. Id. at 44:16-23. (The victim began eighth grade in September of 2009, id. at 45:14-18, the time frame alleged in the first indictment.) By the eighth grade, the petitioner was placing the victim's hand on the petitioner's penis and using it to masturbate. Id. at 46:7-16. This continued from "[t]he beginning, and throughout eighth grade." Id. at 48:2-4. The victim testified as follows:

> Q: Did you ever see your cousin's penis?
>
> A: Yes, I did.
>
> Q: And how often did that happen?
>
> A: I'm not certain—rarely.

Id. at 49:6-9. He also testified that petitioner's penis was, on occasion, capable of being seen:

> Q: And the times that you would take your hand and put it on his penis, was he—how were his pants or underwear?
>
> A: Sometimes it was not fully down, sometimes it wasn't at all. Very rarely was it fully down. I assume because he was afraid that I would wake up.
>
> Q: And was his penis inside of his underwear, or was it exposed?
>
> A: Yes, occasionally it was exposed, but most of the time it was inside.

Id. at 49:20-51:6. As indicated in petitioner's opening statement, the circumstances of the abuse were not always conducive to visibility. According to the victim's testimony,

> Q: Do you remember if the lights were on or off in the room?

4

A: The first time, no, the lights were not on. Actually, the lights were never on.

Q: And were you able to see your cousin when this happened?

A: The first time, or throughout the process, yes, I could, especially if I was facing him.

Q: How often did you open your eyes?

A: Rarely. I mean the second or third time, I just, I needed to identify him. I couldn't believe it was happening.

Id. at 51:7-18.

The victim testified that these events continued "[d]uring the course of ninth grade." Id. at 53:10-14. During the ninth grade, petitioner would "essentially turn [the victim over] to face him, and essentially place his penis touching [the victim's], and masturbate it or put [the victim's] hand on it and masturbate it." Id. at 54:6-8. While doing so, the petitioner's clothes "were pulled down, or [his penis was pulled] through the fly." Id. at 55:7-9. The victim testified that he saw petitioner's penis "[o]nce, because [he] didn't—[he] wasn't sure what was happening, but once [he] figured out, [he] wouldn't look." Id. at 55:10-12.

The last incident occurred right before the victim started tenth grade (in September 2011), a day before his birthday. Id. at 56:4-14. The victim thought the petitioner was going to come to his home so he invited a friend to spend the night, thinking that this would "deter [petitioner] from, you know, trying anything." Id. That night, the petitioner came and lay down next to the victim and "proceeded to fondle [him]. . . . It was actually less severe than other times, because . . . [the] friend was there and [the petitioner] would be afraid that he saw something." Id. at 54:15-22.

Following the victim's testimony, the judge called for a bench conference to clarify the prosecution's theory of exposure. The court asked, "does the penis need to come out . . . out of

5

his pants?" Id. at 132:22-133:3. The prosecution acknowledged that it did, arguing that based on

the case law the victim "needs to have had the opportunity to see [petitioner's] penis" but

"[didn't] necessarily need[] to have seen it." Id. at 133:9-13. The government conceded that it

had not met this standard for all of the indictments, but argued that it had met its burden for the

last three indictments. Id. at 135:16-138:14.

The court asked if the prosecution had case law on the meaning of exposure, specifically

whether the term "exposure" included the petitioner placing the victim's hand on the petitioner's

penis inside his clothing, id. at 143:5-16, noting that "the victim here said that rarely did he see

the penis . . . but it happened frequently, or all the time, that his hand was placed on the penis,"

id. at 144:5-9. The prosecution conceded that it did not have case law on that specific point. Id. at

144:17-19. At the next break, the court reported that it had reviewed Siquina v. Commonwealth,

508 S.E.2d 350 (1998), which relied on the Oxford English Dictionary and Black's Law

Dictionary to define expose as "seen or . . . likely to be seen by casual observers." Aug. 27, 2012

Tr. at 152:3-14. When asked by the court whether this standard was met when the petitioner put

the victim's hand on his penis inside his pants, the prosecution replied,

> if he had taken his hand and put it down his underwear, with his underwear pulled all the
> way up, it's probably unlikely to be seen, but there were also occasions that he testified
> to, that, underwear was down. I mean, he testified to one where he actually saw his penis,
> times when the penis—the penises were touching. I would suggest, certainly that that was
> seen or likely to be seen. . . . Probably more, 'likely to be seen,' because he had his eyes
> closed.

Id. at 152:3-153:12.[1]

The court appeared to interpret the prosecution's position somewhat more broadly,

stating that the prosecution "[was] not asserting . . . that the [petitioner's] fondling of the victim

---

[1] The court later stated, "The [petitioner] can't count on the victim keeping his eyes closed, as a
defense." Id. at 158:21-22.

constitutes the crime that is charged in these indictments. It appears to me that what he is contending, is that when the [petitioner] took the victim's hand and put it on his penis, that those are the acts that constituted the exposure." Id. at 160:21-161:5. The court then pointed to an unpublished en banc opinion from the Court of Appeals, Mason v. Commonwealth, No. 0309-97-2, 1998 WL 778114 (Va. Ct. App. Nov. 10, 1998), for the proposition that "exposure means not only to lay open to view but also to lay open to feel or to touch," and asked the prosecution whether that would "fit the conduct of the victim's hand being placed on his penis?" Aug. 27, 2012 Tr. at 168:23-169:10. The prosecution agreed that it would. Id.

At the close of the prosecution's evidence, petitioner moved to strike all four indictments. The prosecution conceded that it had not met the elements of the statute for the first count, and the court granted the motion to strike as to the first indictment. Id. at 173:12-23. But, the prosecution maintained that, consistent with the cases discussed by the court and the testimony from the victim, the Commonwealth met its burden with respect to the last three counts. Id. at 174:5-15. The court agreed, and denied the motion to strike as to the second, third, and fourth indictments. Id. at 174:19-20.

During the defense's case, petitioner admitted that he had considerable access to the victim during the time periods alleged. Petitioner testified that he stayed at the victim's home from January 2010 through March 2010. Aug. 28, 2012 Tr. at 67:22-68:8. And, although the petitioner took several trips in the spring and summer of 2010, the evidence showed that he was back in Virginia from May 2 to May 21, 2010; May 24 to June 2, 2010; June 8 to July 26, 2010; August 2 to August 22, 2010; August 25 to September 3, 2010; and September 5 to September 11, 2010. Id. at 21:2-24:6. Petitioner testified that he resumed school on September 11, 2010 and returned to Virginia on December 11, 2010. Id. at 24:25:16. He claimed that he stayed with his

parents during the December break, but admitted he attended a dinner at the victim's home on

December 15. Id. at 25:8-26:20. At dinner, the victim spit in his face after which the petitioner

slapped the victim, at which point the victim's parents forbade the petitioner from staying at their

home in the future. Id. Petitioner claimed he was at school in California from January 1 to June

11, 2011, id. at 27:7-13, and was in Virginia from June 11 to June 24, 2011, id. at 27:14-20, and

again beginning on September 1, 2011, id. at 31:9-19. He also acknowledged that he went to the

victim's house on September 2, 2011, the night before the victim's birthday. Id. at 31:20-32:3.

    At the close of the evidence, petitioner's counsel renewed his motion to strike, id. at 78:8-

9, arguing that the victim was not a credible witness and that the acts alleged did not constitute

exposure. The court denied the motion, pointing out that the victim "[said] at various times he

actually saw the penis. . . . He said it was rare but he saw it." Id. at 100:1-8. At the conclusion of

oral arguments, without explaining its reasons, the court found the petitioner guilty of the

second, third, and fourth indictments. Id. at 123:22-124:7.

    After his trial, petitioner, represented by Joshua Didlake and Nina Ginsberg, argued two

motions to set aside the verdict based on claims that the trial court had applied an incorrect

definition of the term "expose" and that the evidence failed to establish with requisite specificity

whether any particular act of exposure occurred within the time frames alleged in the individual

indictments. [Dkt. No. 10-1] at 9. In denying the motion, the trial court explicitly acknowledged

that it was relying on the reasoning in Mason. Nov. 15, 2012 Tr. at 16:6-8 ("[T]his is an en banc

opinion from the Court of Appeals, and I absolutely agree with its interpretation of what

exposure means."). At one point during the argument, the court posed a hypothetical to

petitioner's counsel, "if I conclude that exposure does mean lay open to feel or to touch, you

have to concede that that expands the number of incidents to which the victim testified that

8

would constitute exposure, right?" Id. at 19:17-20. But, the court went on to recognize that the evidence supported a finding of guilt based on the visual exposure: "And I'm not suggesting that the [tactile theory] would be the only way that the [petitioner] could be found guilty of this offense, because there are occasions when the [petitioner] – when the victim said he observed the [petitioner's] penis, he saw it. And there are other occasions when he said he didn't see it but he knew that he had taken it out of his fly. And under [the case law] it doesn't require that the victim actually see the penis but that it be exposed in a way that would make it possible or that would open it to being seen." Id. at 16:16-17:4; see also id. at 21:15-17 ("[T]here were times when the victim testified that he avoided looking at the penis, knowing the penis had been taken out through his fly, so Siquina would have applicability."). At the conclusion of the argument, the court denied both motions. Id. at 57:13-15.

At the sentencing hearing, the district court imposed a prison term of ten years on each conviction, with six years suspended, to be served concurrently.[2] Nov. 15, 2012 Tr. at 123:6-17. According to the Virginia Department of Corrections, petitioner was released from prison on February 1, 2016 and placed on supervised probation. [Dkt. No. 10] at 1-2 n.1.

### B. Direct Appeal to Virginia Court of Appeals

Petitioner appealed to the Virginia Court of Appeals on April 9, 2013, where he was represented by Nina Ginsberg and Jonathan Shapiro. [Dkt. No. 10-1] at 10. Petitioner's counsel raised two arguments: First, that the evidence at trial was insufficient to convict because it was not tied to any particular indictment, a defect that violated petitioner's double jeopardy right and

---

[2] Petitioner's state habeas brief argues that his sentencing guidelines for the three offenses provided a range of three to six months in jail; "nevertheless, the trial court sentenced [petitioner] to concurrent terms of ten years imprisonment with six years suspended on each of the three counts—an active prison sentence of eight times the high end of the recommended sentencing guidelines—with active probation for ten years from the date of [petitioner's] release from prison." Resp. Ex. 1 at 9-10.

inhibited him from properly preparing for trial or presenting an alibi defense. The second

argument was that the trial court relied upon an incorrect understanding of the "exposure"

element of Code § 18.2-370(A)(1). [Dkt. No. 10-1] at 10.

The Virginia Court of Appeals was unpersuaded, affirming the convictions on December

3, 2013 in an unpublished opinion. Record No. 2087-12-4. Regarding the first argument, it found

that between the victim's testimony and the petitioner's admissions, the evidence was sufficient

to link the alleged abuses to the time frames specified in the indictments, id. at 6-8, and

concluded that, although the victim was unable to recall specific dates of each offense, the time

periods were sufficient to identify a particular event within each indictment, id. at 8-10. As to the

exposure issue, the court of appeals affirmed, finding that "'exposure' means not only to lay bare

to view, but to feel or touch." Id. at 5.

### C. Direct Appeal to Virginia Supreme Court

On May 29, 2014, petitioner appealed to the Virginia Supreme Court where he argued

that the appellate court erred by holding that the exposure requirement is met where genitalia is

felt but not seen and determining that the evidence was sufficient to sustain petitioner's

convictions. For relief, appellate counsel asked that petitioner's convictions be vacated and the

indictments dismissed. [Dkt. No. 10-1] at 11.

In its opinion issued on October 31, 2014, Farhoumand, 764 S.E.2d at 95, the Virginia

Supreme Court reversed part of the appellate court's decision, holding that it was error to rely on

Mason, an unpublished decision, in place of earlier published opinions and specifically found

that "the word 'expose,' as it is used in Code § 18.2-370, requires a visual display where the

genitalia are seen, or where there is a possibility that they could be seen. Accordingly, exposure

does not include situations where the genitalia are felt but are otherwise covered or obscured from view." Id. at 100.

The court proceeded to analyze the trial evidence under its definition of exposure, reviewing "the sufficiency of the evidence in the light most favorable to the Commonwealth[.]" Id. at 102. As to the second and third indictments, the court affirmed petitioner's convictions "because there was sufficient evidence to prove that the [petitioner] visually 'expose[d]' his penis to S.F., a minor child, in violation of Code § 18.2-370(A)(1), during the time frames alleged." Id. at 104. Specifically, as to the second indictment, which alleged the exposure between January 1, 2010 and September 3, 2010, petitioner admitted that he fondled the victim four to eight times between March and August of 2010. Id. at 103. The victim stated that the first time petitioner placed the victim's hand on the petitioner's penis and "masturbated himself" was "before the ninth grade began" and when petitioner masturbated himself with the victim's hand, the petitioner's underwear "was not fully down, sometimes it wasn't at all" but "occasionally" the petitioner's penis was exposed. Id. With respect to the third indictment which alleged the exposure between September 4, 2010 and December 31, 2010, the victim testified that he saw the petitioner's penis once during ninth grade and that petitioner touched his uncovered penis to the victim's penis "during ninth grade." Id. The court further found that this evidence, combined with petitioner's access to the victim for at least 17 days during the indictment period, "support[ed] the trial court's judgment convicting the [petitioner]." Id.

The court reversed and vacated petitioner's conviction under indictment four "because the evidence was insufficient to prove that a distinguishable act of visual exposure occurred during the time period stated in the indictment." Id. at 104.

11

Petitioner's motion for rehearing in which he argued that the case should have been remanded to the trial court was summarily denied on January 15, 2015. [Dkt. No. 10-1] at 13.

### D. Habeas Petition to Virginia Supreme Court

On January 14, 2016, petitioner, represented by counsel Jonathan Sheldon, timely filed a habeas corpus petition in the Supreme Court of Virginia. Record No. 160089. Therein, he argued that his due process rights were violated by the court's failure to remand the case to the trial court either for a new trial or for a new determination of guilt under a proper definition of exposure and that his appellate counsel provided ineffective assistance of counsel when they failed to request such a remand on the proper exposure standard and failed to raise well-established United States Supreme Court precedent requiring remand. [Dkt. No. 10-1] at 14, 35.

In an order dated July 5, 2016, the Supreme Court of Virginia denied and dismissed petitioner's habeas petition. [Dkt. 10-2] at 1. As to the first claim, the court found that it was barred because a habeas petition may not substitute for an appeal and because the underlying issue was raised in the petition for rehearing following the court's opinion on direct appeal. Id. at 1-2. Regarding the remand claim, the court broke the claim into two subparts. The first part, which the court construed as arguing that counsel should have sought remand if the Virginia Supreme Court determined that the trial court misinterpreted the statute, was rejected for failing to satisfy Strickland's prejudice prong. Id. at 2. As the court explained, on direct appeal it had determined that "the circuit court did not misapply Code § 18.2-370 and that the evidence was sufficient," thus additional argument regarding the appropriate remedy would have been irrelevant. Id. As to the second part—that counsel should have sought remand if the Supreme Court determined that the trial court misapplied the statute—the court found neither deficient performance nor prejudice. Id. Specifically, the court found that appellate counsel's strategy to

12

ask that the convictions be vacated and the charges dismissed was not "misplaced or irrationally incomplete" because "appellate counsel could have reasonably determined that, instead of pressing for a new trial where the Commonwealth might mend any infirmities in its case, the record was as ripe as could be hoped for establishing the Commonwealth had not carried its burden of proof, thus barring petitioner's further prosecution." Id. at 3. In addition, appellate counsel argued for reversal and remand in the petition for rehearing and petitioner failed to demonstrate that the outcome would have been different had counsel requested reversal and remand earlier. Id. Finally, as to the claim that appellate counsel failed to cite numerous relevant precedents, the court found that petitioner failed to demonstrate that this was objectively unreasonable because he "[did] not allege that counsel conducted insufficient research or misread applicable case law. Standing alone, that counsel may not have discovered or cited additional potentially helpful case law does not amount to deficient performance." Id. at 4.

On October 5, 2016, petitioner filed the instant federal habeas petition. [Dkt. No. 1]. The respondent concedes that the petition is timely and that petitioner's claims were properly exhausted through presentation to the highest state court in state habeas corpus review. [Dkt. No. 2] at 3-5.

## II.    DISCUSSION

### A.  **Standard of Review**

When a state court has addressed the merits of a claim raised in a federal habeas corpus petition, a federal court may not grant the petition on that particular claim unless the state court's adjudication was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts presented at the trial. 28 U.S.C. § 2254(d)(1)-(2). This test erects a "formidable barrier to federal habeas relief" for claims

13

adjudicated on the merits. Burt v. Titlow, 134 S. Ct. 10, 16 (2013). Under this standard, for a petitioner to obtain habeas relief, he "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

The evaluation of whether a state court decision is "contrary to" or "an unreasonable application of" federal law is based upon an independent review of each standard. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court determination violates the "contrary to" standard if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Id. at 413. When reviewing the state court's findings, the federal court is limited to the record before the state court at the time of the decision. See Cullen v. Pinholster, 563 U.S. 170 (2011).

Under the "unreasonable application" clause, the writ should be granted if the federal court finds that the state court "identifies the correct governing legal principle from [the United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. Importantly, this standard of reasonableness is an objective one, and does not allow a federal court to review simply for plain error. Id. at 409-10; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003). In addition, a federal court should review the state court determination with deference; a federal court cannot grant the writ simply because it concludes that the state court incorrectly determined the legal standard. See Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (internal citations omitted). A federal court reviewing a habeas petition "presume[s] the [state] court's factual findings to be sound unless [petitioner]

14

rebuts 'the presumption of correctness by clear and convincing evidence.'" Miller-El v. Dretke,

545 U.S. 231, 240 (2005) (quoting 28 U.S.C. 2254(e)(1)); see, e.g., Lenz v. Washington, 444

F.3d 295, 300-01 (4th Cir. 2006).

### B. Analysis

#### i.   Claim 1

Petitioner contends that the Supreme Court of Virginia, in affirming his convictions for

indecent liberties with a minor in violation of Code § 18.2-370, deprived him of his

constitutional right to due process. [Dkt. No. 2] at 9. In essence, he argues that the trial court

convicted him under a faulty theory of tactile exposure and that the Virginia Supreme Court was

required to remand for a factual determination under the proper theory of visual exposure. As

petitioner acknowledges, he has the burden of establishing that the decision not to remand was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). [Dkt. No. 2] at 7.

The clearly established law upon which petitioner relies is a line of United States

Supreme Court cases that "firmly establish that an appellate court violates basic due process

principles when it affirms a conviction either (1) under a standard different from that under

which a defendant was tried and convicted or (2) on the basis of evidence in the record different

from the evidence on which the defendant's conviction actually was based." [Dkt. No. 2] at 9. In

support of this argument, petitioner points to four cases, Fiore v. White, 531 U.S. 225, 226

(2001), Presnell v. Georgia, 439 U.S. 14, 17 (1978), In re Winship, 397 U.S. 358 (1970), and

Cole v. State of Arkansas, 333 U.S. 196, 197 (1948). Id.[3] None of these cases indicate that the

---

[3] Petitioner also points to the statement in De Jonge v. State of Oregon, 299 U.S. 353, 362
(1937), [Dkt. No. 2] at 9, that "conviction upon a charge not made would be sheer denial of due
process." Id. This holding has no bearing here. As explained below, petitioner was indicted,

judgment of the Virginia Supreme Court was contrary to or involved an unreasonable application of clearly established federal law.

Cole v. State of Arkansas stands for the proposition that a defendant cannot be convicted of one offense and have his conviction affirmed on appeal for an entirely separate offense. 333 U.S. at 197. In that case, the defendants were convicted of violating section 2 of an Arkansas statute, which made it unlawful for a person to assemble with others near a labor dispute and promote or encourage others to engage in such unlawful assemblage. Id. at 198. On appeal, the defendants challenged the sufficiency of the evidence and the constitutionality of section 2. Id. at 200. Rather than address the constitutional question, the Arkansas Supreme Court affirmed the defendant's conviction on the basis of section 1, which made it unlawful for any person to use force to prevent any person from engaging in any lawful vocation. Id. The United States Supreme Court held that defendants had a due process right to "notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge." Id. at 201. As the Court explained, "it is doubtful both that the information fairly informed [the defendants] of that charge; it is certain that they were not tried for or found guilty of it." Id. Rather, "To conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court." Id. at 202. Here, petitioner cannot establish that his conviction was upheld on a charge on which he was never tried. To the contrary, he was tried for indecent exposure under Code § 18.2-370(A)(1) and his conviction was upheld under that same provision. Indeed, petitioner

---

convicted, and denied relief from the Virginia Supreme Court under the same statute, Code § 18.2-370(A)(1), and during the trial the Commonwealth articulated a theory of visual exposure, the same theory under which petitioner's conviction was upheld by the Virginia Supreme Court.

acknowledges as much in his own papers, conceding that "[he] was charged with the offense for which the appellate court ultimately affirmed his conviction." [Dkt. No. 2] at 18.

In Presnell the disparity between the fact-finder's determination and that of the appellate court arose during the penalty phase of trial and involved a misstated element of a statute rather than the substitution of a different provision. 439 U.S. at 17. Presnell was convicted of rape, kidnapping with bodily injury, and murder with malice aforethought, all capital offenses. Id. at 14. At issue on appeal was a jury instruction that the death penalty for the murder conviction required a finding that the murder was committed while the petitioner was engaged in "kidnapping with bodily harm, aggravated sodomy." Id. at 15 (emphasis omitted). The Georgia Supreme Court held that the state could not rely on sodomy as constituting the bodily injury associated with the kidnapping but upheld the capital conviction on the theory that despite the lack of a jury finding of forcible rape, the evidence in the record supported the conclusion that petitioner was guilty of forcible rape. Id. The United States Supreme Court reversed, finding that in the absence of the jury finding forcible rape, defendant's death sentence could not be upheld on the basis that the state appellate court was satisfied that the evidence in the record supported a finding of guilt on that element. Id. at 16. Echoing Cole's holding that a defendant is entitled to have his conviction appraised based on the case as it was tried and the determinations made by the trial court, the Supreme Court concluded that Cole's principle of procedural fairness "applied with no less force at the penalty phase of a capital trial than they do in the guilt-determining phase of any criminal trial." Id. In contrast with Presnell, the circuit court which was the fact-finder in petitioner's case made a finding that the evidence supported a required element of the charged offense, exposure of genitalia to a minor.

Dunn v. United States, 442 U.S. 100 (1979), which petitioner references only in passing, makes the theoretical variance principle alluded to in Presnell more explicit, holding that "appellate courts are not free to revise the basis on which a defendant is convicted simply because the result would likely obtain on retrial." Id. at 101. The defendant in Dunn was convicted of making false statements before a grand jury under 18 U.S.C. § 1623. The indictment charged that defendant's grand jury testimony was inconsistent with statements made "on September 30, 1976, while under oath as a witness" in ancillary proceedings. 442 U.S. at 103-04. At trial, the government introduced statements the defendant made at an evidentiary hearing on October 21, 1976, adopting his testimony in the September 30, 1976 proceedings and recanting much of his grand jury testimony. Id. at 104. The jury instructions specified that the September 30 interview was the basis for the offense. Id. On appeal, the Tenth Circuit concluded that the September 30 interview was not a statement covered by § 1623; however, it upheld the conviction under the theory that the October 21 hearing was an appropriate ancillary proceeding. Id. The Supreme Court reversed based on the "discrepancy between the basis on which the jury rendered its verdict and that on which the Court of Appeals sustained petitioner's conviction." Id. at 106. As the Court explained,

> There is, to be sure, no glaring distinction between the Government's theory at trial and the Tenth Circuit's analysis on appeal. The jury might well have reached the same verdict had the prosecution built its case on petitioner's October 21 testimony adopting his September 30 statement rather than on the September statement itself. But the offense was not so defined, and appellate courts are not free to revise the basis on which a defendant is convicted simply because the result would likely obtain on retrial.

Id. at 107.

Although Dunn is close to petitioner's argument that he was tried under one theory and his conviction was affirmed under another, [Dkt. No. 2] at 14, his argument fails because in

Dunn, the Tenth Circuit adopted an alternative theory of guilt, one not before the trial court.

Here, the prosecution presented and the trial court discussed two theories of guilt and the

appellate court affirmed on one but not the other. Had the trial court ignored the visual exposure

theory and adopted the tactile exposure theory, it would have been error for the Virginia

Supreme Court to substitute its analysis for that of the trial court. But that is not what happened.

Instead, the record supports the conclusion that the prosecution pursued a visual theory of

exposure and the trial court clearly identified testimony that supported a finding of visual

exposure, and the Virginia Supreme Court affirmed on the theory and evidence of visual

exposure presented to the trial court.

     In its opening statement, the prosecution outlined its charge of visual exposure, arguing

that there were "times when [the petitioner] would <u>pull his own pants down</u> and take [the

victim's] hand, and have [the victim] rub his own penis." Aug. 27, 2012 Tr. at 22:17-20

(emphasis added). After the victim's testimony, the trial court pressed the prosecution on the

Commonwealth's theory of exposure, asking "does the penis need to come out . . . out of his

pants?" <u>Id.</u> at 132:22-133:3. The prosecution acknowledged that it did, arguing that based on the

case law the victim "needs to have had the opportunity to see his penis" but "[didn't] necessarily

need[] to have seen it." <u>Id.</u> at 133:9-13.

    The Court: So you're saying that the proof has to be that the [petitioner] took his penis

    out?

    Mr. Gromosaik: At least exposed it in some way, where the complaining witness could

    have seen it.

    The Court: Visual observation.

    Mr. Gromosaik: Right.

Id. at 135:9-14. In a subsequent exchange, the court asked whether the exposure standard that the genitalia had to be seen or likely to be seen, Siquina, 508 S.E.2d at 352-53, was met when the petitioner put victim's hand on his penis inside his pants. Aug. 27, 2012 Tr. at 152:3-153:12. The prosecution responded that the penis met the "likely to be seen" test when the petitioner pulled his underwear down, id., a position consistent with the prosecution's opening statement.

It is also clear that much of the evidence adduced at trial was directed at visual exposure. When examining the victim, the prosecution routinely sought testimony about visual exposure. In response, the victim stated that he saw the penis on at least one occasion and was capable of seeing it on others. Id. at 49:6-7 ("Q: Did you ever see your cousin's penis? A: Yes, I did."); 51:3-6 ("Q: And was his penis inside of his underwear, or was it exposed? A: Yes, occasionally it was exposed, but most of the time it was inside.") In addition to the victim's testimony that during the year he was in the eighth grade he saw the petitioner's penis when the petitioner used the victim's hand to masturbate, id., the victim also testified that during his ninth grade year the petitioner pulled his underwear down or pulled his penis out of his fly to masturbate with the petitioner's penis touching the victim's penis. Id. at 54:6-8; 55:7-9. It was under these circumstances that the prosecution argued that the petitioner's penis was capable of being seen.

Although the trial court ultimately relied in part, most notably for the fourth indictment, upon a tactile theory of exposure that was subsequently rejected by the Virginia Supreme Court, the trial court also explicitly stated both before and after delivering its verdict that there were numerous instances of visual exposure. During the hearing regarding the motion to strike made at the close of evidence, the court stated that the victim "[said] at various times he actually saw the penis. . . . He said it was rare but he saw it." Id. at 100:1-8. And, during the hearing on the petitioner's motion to set aside the verdict, the court explained that a tactile theory of exposure

20

was not the only basis for finding the petitioner guilty: "the victim said he observed the [petitioner's] penis, he saw it. And there are other occasions when he said he didn't see it but he knew that he had taken it out of his fly. And [the case law] doesn't require that the victim actually see the penis but that it be exposed in a way that would make it possible or that would open it to being seen." Id. at 16:16-17:4.

After reviewing the record for sufficiency of the evidence, the Virginia Supreme Court, pointing to the same evidence cited by the trial court, upheld the petitioner's convictions as to the second and third indictments. Farhoumand, 764 S.E.2d at 103-04. In doing so, the court pointed to the victim's testimony that the first time petitioner placed the victim's hand on the petitioner's penis and "masturbated himself" was "before the ninth grade began" (during the January 1, 2010 to September 3, 2010 time period specified in the second indictment) and when petitioner masturbated himself with the victim's hand, petitioner's underwear "was not fully down, sometimes it wasn't at all" but "occasionally" petitioner's penis was exposed. Id. at 104. The Virginia Supreme Court also found that there was sufficient evidence supporting a finding of guilt for visual exposure within the timeframe of the third indictment based on the victim's testimony that he saw the petitioner's penis once during ninth grade and that petitioner touched his uncovered penis to the victim's penis "during ninth grade." Id.

Tellingly, unlike the appellate courts in Presnell and Dunn, the Virginia Supreme Court was not making its findings based on evidence or a theory different from that relied on by the fact finder. Quite to the contrary, the Virginia Supreme Court pointed to the exact same evidence referenced by the trial court when it explained that the evidence supported a guilty finding under the visual exposure theory. In light of this critical distinction, neither Presnell nor Dunn supports

the petitioner's contention that the Virginia Supreme Court's decision not to remand to the circuit court was contrary to or an unreasonable application of federal law.

The remaining cases relied upon by petitioner are equally unhelpful. In re Winship, which holds that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," 397 U.S. at 364, is immaterial because here the petitioner was convicted under the appropriate standard. As explained above, the trial court found that the evidence supported a guilty finding under a visual exposure theory. Neither Winship nor any other authority identified by the petitioner establishes that it was a violation of petitioner's due process rights for the Virginia Supreme Court to review that finding under a sufficiency of the evidence standard. Rather, this is hornbook criminal procedure. See United States v. Royal, 731 F.3d 333, 335 (4th Cir. 2013) ("On appeal from a criminal conviction, [appellate courts] view the evidence in the light most favorable to the government.").

Finally, petitioner cites Fiore v. White for the proposition that "it is unconstitutional to affirm a conviction secured under an incorrect interpretation of a statute that, correctly applied, excluded the conduct for which the defendant was convicted." [Dkt. No. 2] at 9. In Fiore, the defendant was convicted of violating a Pennsylvania statute prohibiting the operation of a hazardous waste facility without a permit. 531 U.S. at 225. The Commonwealth conceded that Fiore had a permit, but argued that he "had deviated so dramatically from the permit's terms that he nonetheless had violated the statute." Id. at 227. The Commonwealth's lower courts agreed but when the Pennsylvania Supreme Court subsequently interpreted the statute for the first time in his co-defendant's case, it made clear that Fiore's conduct was not within the statute's scope. Id. Despite this holding, the Pennsylvania courts refused to grant Fiore collateral relief. Id. The

22

United States Supreme Court granted certiorari and held that "Pennsylvania [could not], consistently with the Federal Due Process Clause, convict Fiore for conduct that its criminal statute, as properly interpreted, [did] not prohibit." Id. at 228.

Petitioner's reliance on Fiore rests on the premise that petitioner was convicted solely for tactile exposure. As explained above, this premise is not supported by the record, which plainly indicates that the trial court found that visual exposure had occurred. Admittedly, the trial court's specific factual findings and, by extension, the extent of its reliance on Mason, are not as well articulated as one might like. But the Virginia Supreme Court found them adequate. To the extent that the petitioner's argument requires this court to review the Virginia Supreme Court's sufficiency of the evidence analysis, the appropriate standard is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original) (internal citations omitted). A federal habeas court may only overturn a state court decision regarding sufficiency of the evidence if the decision was "objectively unreasonable;" it may not overturn the decision simply because it disagrees with the outcome. Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). Under this standard, the Virginia Supreme Court's reading of the record was not objectively unreasonable.

### Claim 2

Petitioner's second claim alleges that he received ineffective assistance of appellate counsel, purportedly because counsel failed to "request a remand for a new trial based on the proper 'exposure' standard" and failed to present due process jurisprudence compelling remand. [Dkt. No. 2] at 18.

To prevail on an ineffective assistance of counsel claim, petitioner must meet the two-pronged test established in Strickland v. Washington, 455 U.S. 668 (1984). Under this test, petitioner must prove both that his attorney's performance was so deficient "that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and that this performance prejudiced the outcome of petitioner's appeal. Strickland, 466 U.S. at 687. To meet the second prong, petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The two prongs, deficient performance and prejudice, constitute "separate and distinct elements." Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). Therefore, a court can appropriately dismiss an ineffective assistance of counsel claim on either prong. Strickland, 466 U.S. at 697; see also Bell v. Cone, 535 U.S. 685, 695 (2002) (internal citations omitted) ("Without proof of both deficient performance and prejudice to the defendant, we concluded it could not be said that the sentence or conviction resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable, and the sentence or conviction should stand"). A court reviewing a claim of ineffective assistance of counsel must presume that counsel acted competently, and should determine the merits of the claim based on the information available to the attorney at the time counsel represented the petitioner. See, e.g., Bell, 535 U.S. at 695; Burket v. Angelone, 208 F.3d 172, 189 (4th Cir. 2000).

Petitioner argues that failure to request remand as compared to another remedy and failure to cite controlling precedent constitute ineffective assistance of appellate counsel, but he provides no authority for these claims. [Dkt. No. 2] at 20-22. As such, he cannot establish that the Virginia Supreme Court's decision to deny his ineffective assistance of counsel arguments

for failing both the performance and prejudice prongs set forth in Strickland was contrary to or

an unreasonable application of federal law.

With respect to the remand claim, the Virginia Supreme Court reasonably concluded that

appellate counsel's strategy to ask that the convictions be vacated and the charges dismissed was

not "misplaced or irrationally incomplete" because "appellate counsel could have reasonably

determined that, instead of pressing for a new trial where the Commonwealth might mend any

infirmities in its case, the record was as ripe as could be hoped for establishing the

Commonwealth had not carried its burden of proof, thus barring petitioner's further

prosecution." [Dkt. No. 10-2] at 3. In addition, as the court explained, appellate counsel sought

remand in the petition for rehearing and petitioner failed to demonstrate that the outcome would

have been different had counsel requested this relief earlier. Id. This conclusion was not contrary

to established federal law. Instead, it is a widely recognized tenet of federal law that "appellate

counsel is entitled to make reasonable choices as to which arguments he or she thinks have the

best chance of succeeding on appeal." Coleman v. Brandon, No. 5:11-CV-131-RJC, 2012 WL

4321328, at *9–10 (W.D.N.C. Sept. 20, 2012). As the United States Supreme Court has

explained, "appellate counsel who files a merits brief need not (and should not) raise every

nonfrivolous claim, but rather may select from among them in order to maximize the likelihood

of success on appeal." Smith v. Robbins, 528 U.S. 259, 288 (2000). Moreover, in choosing

which issues to pursue, appellate counsel "is entitled to a presumption that he decided which

issues were most likely to afford relief on appeal." Pruett v. Thompson, 996 F.2d 1560, 1568

(4th Cir. 1993). In light of the discretion which appellate counsel is afforded, petitioner has failed

to carry his burden of demonstrating that the Virginia Supreme Court judgment is in error.

As to the claim that appellate counsel failed to cite relevant precedents, the Virginia Supreme Court's conclusion—that petitioner failed to demonstrate that this was objectively unreasonable because that "counsel may not have discovered or cited additional potentially helpful case law does not amount to deficient performance," [Dkt. No. 10-2] at 4—was also a reasonable application of federal law. As explained above, none of the cases habeas counsel have cited in their § 2254 petition and which were omitted in their Petition for Rehearing compel the relief requested. Although counsel could have cited these cases to the Virginia Supreme Court, none of the omitted cases would have been dispositive. As a result, petitioner cannot establish either that appellate counsel's performance was defective or that he was prejudiced by their performance.

### III.    CONCLUSION

For the reasons stated above, respondent's Motion to Dismiss [Dkt. No. 9] will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 7 day of February, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge